WILCOX v. ALLEN.

Sextus N. Wilcox and others v. Asa M. Allen and others; and The Lumberman's National Bank of Muskegon v. Sextus N. Wilcox and others.

*Mortgages: Notes: Interest: Payment: Saw-bill.* Upon the sale of certain saw-mill property and pine-lands, the purchaser having given for part of the purchase price his five promissory notes of eleven thousand dollars each, payable one in each year for five successive years, with interest payable semi-annually, secured by mortgage on the property, and the contract of purchase providing that the vendors should furnish to the purchaser, to be sawed at the mill, fifty-five million feet of saw-logs in quantities of eleven million feet per annum, and to pay him for sawing the same, and that one dollar per thousand feet of the saw-bill was to be retained by the vendors and applied each season in payment of the principal of the note then next maturing, it was held, that it was the evident intent of the parties, as expressed in their agreement, that the one dollar per thousand feet thus reserved from the saw-bill of each eleven million feet should be in full satisfaction of the note then next maturing, and that the note should not bear interest during that year, if paid in sawing in this manner; the payments for sawing beginning on May 1st, and continuing in monthly installments during the sawing season, which would close in October or early in November, and the notes not maturing till January, the average time of payment by means of the sawing would be nearly six months before the principal would become due according to the terms of the note.

*Contracts: Several instruments: Single transaction: Construction.* The contract of sale of the mill property and land, with the agreement to furnish the logs for sawing, and the notes and mortgage given for the purchase price, are all construed together as constituting but one transaction.

*Contracts: Payment: Application: Saw-bill.* The contract between the parties being afterwards modified so as to give the vendors the option to furnish fifteen million feet of logs during the first season, instead of eleven million, with the option to the vendee of applying any portion of the saw-bill of the additional four million feet of logs in payment of the purchase-price notes, it is held this agreement gave the mortgagor the option of applying the saw-bill of any additional logs delivered under the agreement in payment of any of the notes, and was broad enough to authorize its being applied by him in payment of either principal or interest upon any or all of the notes.

*Contract construed: Manufacturing lumber: Scaling: Excess.* The contract providing for the logs being scaled in the mill by a competent scaler whose appointment was provided for, and that the party doing the sawing was to deliver the same number of feet of merchantable lumber as would be equivalent, board measure, to the total scalage of the logs delivered, it is held that when he had complied with this provision he had delivered all he was bound to under the contract, and he was entitled to any excess.

WILCOX v. ALLEN.

*Mortgages: Interest clause: Election to declare whole due: Dispute as to interest due.* Under an interest clause in a mortgage, providing that upon default for more than sixty days in the payment of interest after it comes due, the whole principal should, at the option of the mortgagees, become immediately due and payable, it is held that where the mortgagor in good faith and upon reasonable grounds denied his liability to pay interest, or claimed that he had paid it, he could not by virtue of this clause be made liable to pay the whole principal at once, even though it should turn out, upon trial of the matter, that he was in error. This clause is in the nature of a forfeiture or penalty, its object being to punish for the willful neglect of a clear duty, and to hold it applicable to a case where there was an honest dispute, would be harsh and unjust, and contrary to equity.

*Mortgages: Insurance collected: Payment.* The mill having been insured and subsequently destroyed by fire, and the insurance transferred, according to agreement, to the mortgagees to be collected and applied as fast as collected in payment of the mortgage indebtedness, the insurance thus collected should be allowed as payment upon the mortgage.

*Mortgages: Payment by sawing: Mortgagees: Assignee: Insurance collected.* The mortgagees having assigned the notes and mortgage to a trustee, in trust to pay certain indebtedness of theirs, under an arrangement that upon default on their part the notes and mortgage were to be sold and from the proceeds their debt and interest paid and the balance if any turned over to the assignors, and the beneficiary under such trust having full knowledge of the provisions as to payment by sawing, and also of the agreement as to the insurance, and that the mortgagees were expected to collect the same, the assignee is held bound under the circumstances by the agreements and dealings in this regard between the mortgagor and the mortgagees.

*Mortgages: Foreclosures: Assignment: Cross-bill.* One of the several notes secured by the mortgage having been turned out by the mortgagees as collateral to an indebtedness of theirs to a party whose equities might turn out to be different from theirs, it was competent for such assignee to file a cross-bill; and the fact that his interests would be fully protected as defendant in the original cause in case the complainants therein prevailed, would be no ground for holding the cross-bill improperly filed, where in case the original bill were dismissed, the complainant in the cross-bill would thereby be deprived of the means of obtaining the relief to which he might be entitled.

*Mortgages: Several notes: Priority.* Where several notes of like date, but falling due at different times, are secured by one mortgage, it is error in a foreclosure decree to give priority to any of the notes.

*Mortgages: Assignment as collateral: Cross-bill: Personal liability of assignors.* Mortgagees having assigned as collateral to their indebtedness one of several notes secured by the mortgage, and having filed a bill to foreclose the mortgage, and their assignee having thereupon filed a cross-bill to protect his interests, it is competent on such cross-bill to render a decree holding said mortgagees personally liable to their assignee for any deficiency, though they have not made themselves liable upon the note as endorsers or otherwise, they being liable to him upon the original indebtedness sought to be recovered.

*Heard January 12. Decided April 10.*

Appeal in Chancery from Muskegon Circuit.

WILCOX v. ALLEN.

*Hughes, O'Brien & Smiley,* for complainants.

*Smith, Nims & Erwin,* for defendants.

MARSTON, J:

Theodore B. Wilcox, Albert B. Wilcox, L. C. Paine Freer and Sextus N. Wilcox, filed a bill to foreclose a mortgage executed by Asa M. Allen and dated November 22, 1872, which was given to secure, amongst other things, the payment of certain promissory notes executed by the latter to T. B. Wilcox & Co., in accordance with the terms of an agreement of even date therewith, by which Wilcox & Co. sold certain mill and other property in Muskegon to Allen. T. B. Wilcox & Co., being indebted to Sextus N. Wilcox, upon the same day, November 22d, assigned certain of these notes and the mortgage to Freer in trust to secure the payment of their indebtedness to Sextus N. Wilcox.

Although the bill of complaint sets forth and alleges that complainants sustained and are entitled to damages because of non-performance and violation of the covenants and agreements contained in the contract for sawing, yet, as we understood counsel on the argument, and as set forth in their brief, this portion of the case is not insisted upon, complainants resting their case upon defendant's default in not paying interest upon the notes according to the terms thereof, the effect of which was, under a clause in the mortgage, to render the entire debt due at the option of the mortgagees.

The contract of sale of the lands, the notes and the mortgage are of even date, November 22, 1872, and all constituted but one transaction.

Theodore B. Wilcox and Albert B. Wilcox, composing the firm of T. B. Wilcox & Co., of the first part, and Asa M. Allen, of the second part, upon the 22d day of November executed a written agreement, by which the first parties sold and agreed to deliver to the second party their certain mill property at Muskegon with other property. After the

formal parts and description of the property sold, the contract proceeds as follows:

"And whereas, the sale price of said entire property was the sum of sixty-five thousand dollars, the payment of fifty-five thousand dollars of which sum is to be paid in five installments of eleven thousand dollars each, evidenced by five promissory notes for said respective sums, dated of even date herewith, and payable to the order of T. B. Wilcox & Co. on the first day of January of each of the years A. D. 1874, A. D. 1875, A. D. 1876, A. D. 1877, and A. D. 1878, at the banking office of Lunt, Preston & Kean, in said Chicago, with interest at and after the rate of seven per cent. per annum, payable semi-annually, the interest beginning to run on the first day of January, A. D. 1873: Now, said parties of the first part, in consideration of the covenants and considerations hereinafter specified to be kept and performed by said party of the second part, agree and covenant to and with said party of the second part, his executors and administrators, to deliver at the boom of the above specified mill fifty-five millions of feet of merchantable pine saw-logs in quantities of eleven millions of feet per annum, and beginning to deliver the same as soon as the Muskegon Booming Company shall begin operations in the spring of the year, A. D. 1873, and annually thereafter, and to continue to deliver the same through the seasons of each year, beginning with A. D. 1873, as aforesaid, as fast as the said booming company shall or may assort, raft and tow the same.

"And said parties of the first part, in consideration of the premises recited, agree to and with said second party to pay him for sawing said lumber as follows: For the first year's operations at and after the rate of three dollars and fifty cents for each thousand feet, board measure; two dollars and fifty cents, board measure, on each thousand feet, to be paid at Muskegon, on the first day of each month during the sawing season, beginning on May 1st, A. D. 1873, such payments to be made on the amount of lumber shipped as shown by the certificate of inspection, or in case

said lumber shall be piled along said switch track there upon the certificate of measurement by the measurer agreed upon by the parties as above provided.

"And as to the remaining one dollar per thousand feet of lumber sawed, the same shall be retained by said first parties and be applied by them on the first of the notes so as aforesaid to be given by said second party, then next maturing.

"And for each of the remaining years' business under this contract, and for sawing and piling, as aforesaid, said parties of the first part agree to pay to said second party from year to year, in equal monthly installments, as above provided, and at the place aforesaid, the average market price for manufacturing on Muskegon lake, reserving, however, in each year, at the rate of one dollar per thousand feet, the same to be applied in the payment of the principal sum of any of said notes due or then next maturing.

"And it is further agreed that at the end of each sawing season, under this contract, if the sum of one dollar per thousand feeet, so to be reserved, shall have been more than sufficient to pay the principal of the note falling due for the current year, the excess shall be paid to said second party on demand."

The notes are in the usual negotiable form, "with interest at seven per cent., payable semi-annually."

The mortgage is given to secure the payment of sixty-five thousand dollars, the balance of the purchase price of the lands, evidenced by five promissory notes, each in the sum of eleven thousand dollars, and falling due respectively on the first days of January in each of the years 1874, 1875, 1876, 1877, and 1878, "and drawing interest from and after the first day of January, A. D. 1873, at and after the rate of seven per cent. per annum, payable semi-annually." There was another note secured by this mortgage, given for the sum of ten thousand dollars, payable January 1, 1873, without interest.

On the 20th day of January, 1873, there was a written

modification or addition to the contract of November 22d, that portion thereof bearing upon this question being as follows:

"Now this is to certify that in case said first party shall elect on or before May 1, 1873, to deliver to said second party fifteen million (15,000,000) feet of logs instead of eleven million (11,000,000) feet as provided in the contract above mentioned, then and in that case the said second party hereby agrees to saw such additional four million (4,000,000) feet in all respects on the same terms, conditions, price, etc., as provided in said contract for the sawing of the eleven million (11,000,000) feet before mentioned, with the exception that said second party shall have the option of applying any portion of the saw-bill of the said additional four million (4,000,000) feet of logs on the payment of the mill notes due by said second party to said first party on the first day of January of each of the years 1874, 1875, 1876, 1877 and 1878."

Other modifications and changes were made, but they need not here be noticed.

We do not deem it necessary at present to make a careful examination of the accounts existing between these parties, for the purpose of ascertaining the exact indebtedness at the time the bill was filed. An examination and settlement of the legal questions in dispute between them will, we think, be all that will be required in the present controversy.

I. According to the express terms of the contract, also of the notes and mortgage, interest was to be paid upon the notes semi-annually, and we find nothing in any of these papers inconsistent with the clearly expressed agreements, except as next noticed.

II. The contract specifically points out the time and manner in which these notes were to be paid. The mortgagees were to deliver at the mill-boom fifty-five million feet of merchantable pine saw-logs in quantities of eleven million feet per annum, the first to be delivered in the

spring of 1873, and to be delivered annually thereafter. These logs were to be received by the mortgagor and manufactured into lumber at this, his mill, and he was to receive for manufacturing, piling, etc., for the first year at the rate of three dollars and fifty cents per thousand, and for each of the remaining years the average market price for manufacturing on Muskegon lake. The mortgagees were to pay a certain portion of the price so agreed upon for manufacturing in equal monthly installments, and the contract provided how the quantity should for this purpose be ascertained. In each year one dollar per thousand was to be reserved by the mortgagees and to be by them applied upon the notes then due or next maturing, and if the amount so reserved should be more than sufficient to pay the note falling due for the current year, the excess was to be paid to the mortgagor on demand. We think the evident intent of the parties, as expressed in this agreement, was, that the one dollar per thousand reserved upon eleven million feet, would be in full satisfaction of the note then next maturing; that the note during that year should not, if paid in sawing, draw interest. The parties in thus providing that eleven thousand dollars should be reserved and be applied in the payment of the principal sum, meant thereby to exclude all idea of the payment of interest. The parties in contracting, the one to deliver and the other to saw, fifty-five millions of feet of merchantable pine saw-logs in quantities of eleven million feet per annum, undoubtedly intended that the one dollar reserved upon this quantity each year would satisfy and pay in full the note then next due, and as these logs were to be delivered in the boom, and scaled in the mill by a competent person, which would be the first opportunity afforded for ascertaining the exact quantity delivered in any one season, it is a reasonable presumption that the parties supposed the quantity delivered might over-run eleven million feet, and be sawed during that year. They therefore, to meet this state of things, provided that if the sum so reserved should be more than

sufficient "to pay the principal of the note falling due for the current year, the excess should be paid to said second party on demand." If interest was to be paid, we can see no object in requiring the excess to be thus paid on demand to the mortgagor by the mortgagees, if the latter was at the same time entitled to demand and receive back interest for the current year upon the note, the principal of which had been paid.

There is still another reason for coming to the same conclusion. Eleven million feet of logs were to be sawed each year, the saw-bill was to be paid by the mortgagees at Muskegon on the first day of each month during the sawing season, beginning on May 1st, less one dollar per thousand feet, which was to be retained by the mortgagees "and be applied by them on the first of the notes so as aforesaid to be given by said second party, then next maturing." In accordance with this provision of the contract, payments would be made upon the notes nine months before the principal became due, and two months before the semi-annual interest would be payable, if interest was to be paid, and as the sawing season would close in October or early in November, the entire note would be paid before it became due. This the parties must have taken into consideration, and as the average time of payment would be nearly six months before the principal would become due, they agreed that payment of the principal should be in full satisfaction of the note, and such, we think, is the fair legal construction of their agreement.

III. As to the interest upon notes not thus maturing and being paid, whatever the rule might have been under the contract of November 22d, we think the agreement of January 20, 1873, clearly gave the mortgagor the option of applying any portion of the saw-bill of any additional logs delivered under that agreement, in payment of any of the notes given. This agreement is certainly broad enough to authorize the payment of either principal or interest upon any or all of said notes.

IV.  It appears that the scale of the manufactured lumber exceeded the log scale.    Defendant Allen claims that he is entitled to retain as his own property any such excess of lumber, and that where a portion of such excess has been delivered to or received by the mortgagees, the value thereof should be credited him upon any balance found due upon these notes.    The mortgagees deny Allen's right to any such excess.    We held in *Wilcox et al. v. Allen, January Term, 1876*, that under this contract Allen was entitled to all such excess lumber, and we have as yet seen no reason for changing the conclusion then arrived at.    The logs were to be scaled in the mill by a competent person, and the parties were very particular in providing how such party should be chosen in case they could not themselves agree upon a scaler.    And Allen agreed to deliver to said first parties, T. B. Wilcox & Co., in the manner specified, "the same number of feet of merchantable lumber as above specified, equivalent in the number of feet, board measure, to the total scalage of the logs to be delivered."    When Allen had complied with this clause, he had delivered all he was bound to under this contract.    Allen was entitled to the unmerchantable lumber and slabs, and did not, however, agree to deliver to them all the merchantable lumber manufactured from the logs, and that it should at least be equivalent in the number of feet to the total scalage of the logs to be delivered.    It is not at all clear that this excess comes from the logs delivered.    The evidence tends to show logs received into the boom from other sources and sawed in the mill, which would account in part or wholly for this excess.

V.  The mill purchased by Allen from the mortgagees was destroyed by fire in June, 1874.    There was an insurance at that time upon it of thirty-five thousand dollars. This insurance was, under an agreement made between Allen and T. B. Wilcox & Co. July 18, 1874, to be assigned to T. B. Wilcox & Co., who were diligently to prosecute and collect as far as practicable the amount thereof, and as fast as collected apply it in payment of this mortgage indebted-

ness.    The policies were assigned and T. B. Wilcox & Co. collected upwards of twenty-five thousand dollars thereon previous to January, 1875.    This money so collected should have been applied in payment of the mortgage indebtedness as the parties agreed, unless, as claimed, the rights of S. N. Wilcox would be affected thereby, which we shall notice hereafter.    The liability of T. B. Wilcox & Co. for insurance assigned but not collected we do not decide, as the facts bearing thereon are not sufficiently before us.

VI.    It is also claimed that the interest upon these notes having been unpaid, notice was given by the mortgagees in March, 1874, of their option to consider the whole amount of the notes, both principal and interest, due, under a clause in the mortgage providing that if any interest was due and remained unpaid for a period of sixty days thereafter, the whole of the principal sum evidenced by said notes should thereupon, at the option of the mortgagees, become immediately due; and the bill of complaint was filed in this case claiming the whole amount due upon this theory.

Whether any interest will be found to have been due at the time such notice was given, under the views we have expressed, we do not at present determine.    We are all clearly of opinion that advantage can only be taken of a clause of this kind in a case where there can or ought to be no reasonable dispute between the parties as to the amount due and unpaid.    Where the mortgagor in good faith and upon reasonable grounds denies his liability to pay interest, or if he is so liable, claims it to have been paid, he cannot thus be made liable, even although it should turn out that he was in error.    This clause is in the nature of a forfeiture or penalty.    Its object is to punish for a willful neglect of a clear duty, and to hold it applicable to and apply it in a case where there was an honest dispute, would be harsh and unjust, and contrary to all well settled equitable principles.

VII.    Is Sextus N. Wilcox bound by the agreement and dealings between Allen and T. B. Wilcox & Co. and by the assignment of the insurance policies to the latter?    The

36 MICH.—22.

assignment made by T. B. Wilcox & Co. of these notes and
mortgage was to secure the payment of a certain indebted-
ness owing by them to Sextus N. Wilcox.    In case of de-
fault on their part the trustee was authorized to sell the
Asa M. Allen note and mortgage at public auction to the
highest bidder, and from the proceeds of such sale to retain
the amount owing him, with interest and costs, the balance,
if any, to pay over to the assignors, T. B. Wilcox & Co.
It is not claimed that Sextus N. Wilcox did not at the time
of this assignment have full knowledge of the contents of
the mortgage and contract of November 22d.    He knew
that these notes were to be paid by sawing to be done for
the mortgagees, and that a clause was contained in the
mortgage requiring the mill property to be insured, and in
case of loss, that the mortgagees should be permitted to
collect such insurance in their own name or in the name of
the insured to their use, and that the amount so collected
should apply upon the notes then matured, or then first ma-
turing and remaining unpaid.

Sextus N. Wilcox was examined and testified that he
knew of the destruction of the mill and of the amount of
insurance thereon; that he had informed T. B. Wilcox &
Co. he should look for his pay out of this insurance, and
was by them informed that they did not control the insur-
ance at that time, Mr. Allen not having assigned the poli-
cies.    He also testified that he notified them "that as soon
as the policies were assigned properly so that they could
control them, that they should give me enough of the poli-
cies to pay the amount my due."    He says he had no
knowledge of the assignment at the time it was made, but
testified: "I supposed the policies were in their hands (T. B.
Wilcox & Co.) ready to transfer to me on demand up to the
last hour.    When I demanded the policies they turned over to
me what policies they had then uncollected, which proved
to be eleven thousand five hundred dollars, and the bulk of
it is uncollected to-day.    I was very much disappointed at
the result and blamed them very much."    When asked if

he had called them to account for what they had collected, his answer was: "I never have called on them; I have claimed that they did me an injustice in the matter and violated good faith, as I thought, to collect them without my knowledge." There is other evidence in the case bearing upon his knowledge of the assignment from Allen to T. B. Wilcox & Co., and of his want of such knowledge. We think the above is sufficient to show pretty clearly that he expected the policies would be assigned to them, and that he looked to them, in the first instance, and not to Allen, for the policies or their proceeds.

There is another somewhat important fact in this connection. The notice of default in the payment of interest, and election to consider the whole amount due, served upon Allen, is dated, or was served rather, on the 14th of March, 1874. It purports to have been signed for the mortgagees, trustees and Sextus N. Wilcox, by T. B. Wilcox, and requires payment of the entire mortgage debt to be made to Theodore B. Wilcox or Albert Wilcox. This was the only notice served. The bill was filed relying thereon, and the notice does not seem to have been at any time repudiated by any of the parties by whom it purports to have been signed. If this notice was given with authority, then payments or assignments made to T. B. Wilcox & Co. would bind all the parties thereto. From the evidence in this case, we are of opinion that the insurance should be applied as the parties agreed, and that Sextus N. Wilcox is bound by the acts of T. B. Wilcox & Co. in the premises.

VIII. It remains but to consider the questions raised upon the claim under the cross-bill. Complainants in the original bill insist that a cross-bill was not necessary; that the bank could have obtained full and complete relief in the original cause. This, perhaps, would be true if complainants in the original cause should succeed in obtaining a decree. If, however, they at any time had dismissed their bill, or the court upon the hearing had dismissed it, we do not well see how the bank (defendant in the original, and complainant

WILCOX v. ALLEN.

in the cross-bill) could have obtained a decree for the amount of its claim, no matter how clearly it may have been entitled to it.   We think the bank was not obliged to run any such risks, and that the cross-bill was properly filed under the circumstances.   The cross-bill was taken as confessed, and a decree rendered in favor of the bank for the amount of its claim, and giving it priority over the other notes secured by this mortgage.   We are of opinion that such a decree should not have been granted—so far as it gives priority.   There is nothing in this case to take it out of the general rule, as laid down in *English v. Carney, 25 Mich., 178,* and *McCurdy v. Clark, 27 Mich., 445.*   A majority of the court are of opinion that the proceedings by the bank were for the purpose of collecting its indebtedness against Theodore B. and Albert Wilcox, and that although these parties may not be personally liable upon the note delivered by them to the bank, as endorsers or otherwise, yet they are liable upon the original indebtedness sought to be recovered.

We think, therefore, the case comes within the provisions of our statute, holding the Wilcoxes personally liable, and will tend to prevent multiplicity of suits.

As under the view we have taken of the legal questions in this case, there was not any thing due complainants in the original suit at the time their bill was filed, the decree dismissing it must be affirmed.   The decree in the cross-bill will be modified as to priority, and as modified, be affirmed.

Defendant Allen to recover costs in original suit, and to be without costs to the other parties in either original or cross-bill.

The other Justices concurred.